**MULLER et al. v. KILLAM et al.**

No. 4682.

Court of Civil Appeals of Texas. El Paso.

Dec. 14, 1949.

Rehearing Denied Jan. 4, 1950.

U. S. Algee, M. J. Raymond, and Mann & Mandel, all of Laredo, Black & Stayton, Austin, for appellants.

Nat. L. Hardy and Carl Wright Johnson, San Antonio, John G. Hurd and Elmore H. Borchers, Laredo, for appellees.

McGILL, Justice.

This is an appeal from a judgment of the 49th Judicial District Court of Webb County. In the trial court appellants A. F. Muller, Maurice Alexander and Roslyn Alexander Mandel, joined pro forma by her husband Max A. Mandel, as plaintiffs, sought a declaratory judgment against appellees O. W. Killam and Mrs. Anita Ugarte de Ortiz as defendants, decreeing that plaintiffs under certain written instruments dated July 11, 1947, and August 28, 1947, owned the equitable title to approximately twenty thousand acres of land in Webb County therein described, or had the right to obtain such title by payment of the sum of $156,362.24 to defendant O. W. Killam, and that a certain deed dated September 1, 1947, and signed by Mrs. Anita Ugarte de Ortiz purporting to convey said property to O. W. Killam was null and void, and cancelling same. It appears from the judgment that defendant O. W. Killam filed a cross action against plaintiffs in which he made appellants Joe A. Ortiz and P. O. Villarreal defendants and in which he sought to recover title and possession of the land and to have removed therefrom the cloud existing on his title thereto by reason of the instruments of July 11th and August 28th, 1947. The defendant Mrs. Anita Ugarte de Ortiz filed an answer in which she plead the execution of the deed to defendant O. W. Killam, disclaimed any interest in the property other than her vendor's lien and deed of trust lien thereon which she alleged that she released as to the 20,000 acres if same should be adjudged to plaintiffs, and also that she released any interest in any money that might be adjudged to defendant Killam, and prayed that she be dismissed with her costs. The cross defendants Joe A. Ortiz and P. O. Villarreal answered adopting the pleading of plaintiffs and seeking the same relief as plaintiffs against defendants Mrs. Anita Ugarte de Ortiz and O. W. Killam. Trial was to a jury. On motion of defendant Killam the court rendered judgment that plaintiffs take nothing against defendants Anita Ugarte de Ortiz and O. W. Killam; that cross-defendants and cross-plaintiffs Joe A. Ortiz and P. O. Villarreal take nothing as to any of the parties to the suit, and that cross plaintiff O. W. Killam recover against plaintiff and cross plaintiffs and defendants Joe A. Ortiz and P. O. Villarreal title and possession of the land in controversy and that the cloud existing on his title thereto by reason of instruments of July 11 and August 28, 1947, be removed.

Proceeding on the assumption that it was necessary that they review every possible theory on which the trial court could have predicated its judgment against them, appellants have presented and briefed forty points on which they predicate their appeal. We have carefully considered all such points. However, we deem it unnecessary and impracticable to discuss them seriatim in this opinion. Such discussion would prolong this opinion beyond all reasonable bounds, and ignore repeated admonitions of both bench and bar to shorten our opinions where possible.

The issues as we view them are comparatively simple. Mrs. Anita Ugarte de Ortiz, a widow, was the owner of a ranch located in Webb County, consisting of approximately 80,000 acres. On July 11, 1947, she entered into the following agreement as owner with P. O. Villarreal and Joe A. Ortiz, who was her adopted son, as agents:

"This Contract, made this day by and between Anita Ugarte de Ortiz, hereinafter styled Owner, and P. O. Villarreal, also known as Plutarco Villarreal, and Joe

A. Ortiz, hereinafter styled Agents, all of Webb County, Texas, is executed to show that in consideration of the covenants herein made and on the conditions herein set out, it is agreed by and between said parties as follows:

"1. Said Owner gives and grants to said Agents the exclusive right for a period of Ninety (90) days from this date to find, produce and present to the Owner a buyer who is able, ready and willing to buy and pay for the hereinafter described land at a price which will net the Owner Eight and no/100 ($8.00) Dollars per acre, and it is understood that the Owner will not be liable to the Agents for any commission, but that the latter are to look alone to any excess above Eight Dollars ($8.00) per acre for which they may sell said premises.

"2. It is understood that the Owner is to be at no expense whatever and will not be liable for any commission or any failure on the part of the buyer to accept the title of the land referred to.

"3. In case of sale, the Owner will loan to the Agents such abstracts of title as she may have of the land in question, but the same are to be returned to her after having been examined, and the Agents will furnish any supplemental abstracts that may be required by the purchaser.

"4. In case of a sale of the land, the Owner will require the same to be surveyed without expense to her, but the surveyor who may be chosen to make the survey, shall be satisfactory to the Owner.

"5. It is distinctly understood and agreed that while the Owner has a good and defensible title, she does not represent that her title is marketable as she does not know, and she agrees to sell only such title as she has, and the Agents accept this with that understanding.

"6. In case of a sale of the premises or a substantial portion of the same, any sales contract will not be binding on the Owner unless and until she has approved the same and signed it, and she alone will have the right to determine whether the contract of sale is satisfactory to her.

"7. In the event of a survey of the premises, the Agents shall cause a plat or plats thereof to be made and furnished one such plat to the Owner showing just what she is selling and the exact acreage contained within the boundaries of such tract or tracts.

"8. It is agreed that this contract is subject to the terms of the grazing lease executed by the owner to Cage Brothers Cattle Company and any other rights which the Cage Brothers Cattle Company or anyone else has with refard to the tract or tracts of land that may be sold, and particularly to an outstanding option given by the Owner to L. F. Gilliland, and which will expire on or about May 4th 1947, unless exercised by the said L. F. Gilliland or his associates.

"9. The Agents are to be responsible for the attorney's fees incident to the preparation of this contract and of the sales contract in the event the land may be sold. In case the same may be paid by the Owner, the Agents will reimburse the Owner for any amount paid out on that account by her.

"10. The Agents shall be entitled to any excess of the sales price remaining aftter the Owner shall have received Eight Dollars ($8.00) per acre net to her, and shall look alone to such excess for their remuneration after paying such expenses as they may be liable for in connection with the sale of the premises.

"11. The land referred to consists of land out of the nothern part of what is known as the L. R. Ortiz Ranch located about fifteen miles north of the City of Laredo, in Webb County, Texas, and consisting of the following pastures and parts of pastures composing a part of said ranch:

"(a) All of what is known as the Middle Pasture;

"(b) All of what is known as the Charco Pasture;

"(c) The West one-half of the Abras Pasture;

making an aggregate of approximately Twenty Thousand (20,000) acres.

"12. The Agents agree to use their best efforts and go to whatever expense may be reasonable necessary to place the said premises before possible purchasers and be responsible to the Owner for the return of any abstracts that may be loaned to them or to the purchaser or his attorney, and to pay for any supplemental abstracts and for the surveying of the land and any other expenses incident to the sale thereof, so that the consideration of Eight Dollars ($8.00) per acre net to the Owner shall be received by her as hereinabove agreed. The Agents hereunder are required to sell the whole and not merely a part of said premises.

"13. This instrument shall be binding upon the parties hereto, their heirs and assigns, but unless the term hereof be extended in writing, shall automatically expire by its own terms.

"In Witness Whereof the said parties have hereunto subscribed their names this 11th day of July, 1947, executing this instrument in duplicate originals of equal standing.

"(Signed) Anita Ugarte De Ortiz,
. Owner,
"(Signed) P. O. Villarreal,
"(Signed) Joe A. Ortiz,
Agents."

On or about August 7, 1947, Mrs. Ortiz agreed verbally with defendant O. W. Killam that she would sell him the entire ranch, which included the 20,000 acres described in the above instrument. No written contract was entered into, but the details of the oral agreement were to be incorporated in the papers on which the deal was to be closed. These papers were prepared by Mr. Yale Hicks, who had been Mrs. Ortiz' attorney and business adviser for many years. It was understood that the deed to be signed by Mrs. Ortiz and the notes for the balance of the unpaid purchase price and deed of trust securing them to be signed by Killam should be dated September 1st. The evidence is uncontroverted that this was to be done because Mrs. Ortiz preferred to have the payments come due on the first of the month rather than during the month. It

was also understood that Killam was to pay Mr. Hicks his attorney's fee, and that Joe Ortiz, Mrs. Anita Ugarte de Ortiz's adopted son, should be satisfied with the deal. Before he finally agreed to the deal with Mrs. Ortiz, Killam agreed to pay Joe Ortiz $10,000.00 to obtain his approval of the deal, and ascertained from Hicks that it would require about $20,000.00 to satisfy his fee. The papers were prepared by Hicks and were taken to Mrs. Ortiz's home by his secretary, Miss Amelia Ochoa, on the evening of August 26, 1947. Miss Ochoa explained the instruments to Mrs. Ortiz in English and in Spanish that evening, and Mrs. Ortiz made arrangements to close the deal the next day, August 27th. On that day O. W. Killam and his son, Radcliffe Killam, came to Mrs. Ortiz's home at about 11:30 o'clock in the morning, accompanied by a Notary Public, Jose C. Salazar, Jr. Miss Ochoa was also there. Killam wrote a check for $150,-00.00 and signed vendor's lien notes totaling $428,673.25, representing the balance of the agreed consideration, and executed a deed of trust securing such notes. He then handed check, notes and deed of trust to Mrs. Ortiz. The notes and deed of trust were dated September 1, 1947, the check was dated August 27, 1947. Mrs. Ortiz signed and acknowledged a deed purporting to convey the entire 80,000 acre ranch to Killam. The deed and certificate of acknowledgment were dated September 1, 1947. In answer to a special issue the jury found that Mrs. Ortiz " * * * with the knowledge of Mr. O. W. Killam, gave the deed to the 80,000 acre Ortiz ranch (which includes the 20,000 acres in question in this suit), to Miss Amelia Ochoa, the secretary of Mr. Yale Hicks, with the intention on the part of the grantor, Mrs. Ortiz, that Mr. Hicks receive the deed and that he deliver it to Mr. O. W. Killam on the 1st day of September, 1947." The deed was filed for record in the Deed Records of Webb County on September 2, 1947. It contains the following provisions:

"2. This conveyance is made subject to the terms of an option contract executed by me to P. O. Villarreal and Joe A. Ortiz

as Realtors, dated the 11th day of July, 1947, to sell for me approximately Twenty Thousand (20,000) acres out of the West or Northwest corner of the L. R. Ortiz Ranch, which option expires Ninety (90) days from date of said option.

"5. I hereby assign and set over to the grantee herein all of my rights in, to and under the terms of said instruments and each of them, and said grantee herein, hereby assumes all of my obligations and liabilities under said instruments and assumes and agrees to discharge all of my obligations under any of said instruments *to the party or parties thereto, their heirs, successors and assigns, to the same extent as I would be required to do.*" (Emphasis ours.)

On August 28, 1947, the following instrument was signed by P. O. Villarreal and Joe A. Ortiz, as agents of Mrs. Anita Ugarte de Ortiz as first parties, and Maurice M. Alexander as second party;

"This Agreement made in triplicate by and between P. O. Villarreal and Joe A. Ortiz, as agents of Anita Ugarte de Ortiz, hereinafter referred to as First Parties, all of Webb County, Texas, and Maurice M. Alexander, herein referred to as Second Party.

"Whereas, the said Anita Ugarte de Ortiz as owner of a tract of land in the County of Webb and State of Texas, hereinafter described, entered into a written agreement with the said P. O. Villarreal and Joe A. Ortiz on the 11th day of July, 1947, wherein the said Anita Ugarte de Ortiz gave and granted to the said P. O. Villarreal and Joe A. Ortiz the exclusive right for a period of 90-days from said date to find, produce, and present to the owner a buyer who is able, ready and willing to buy and pay for the land described in said agreement at a price which will net the owner a price of $8.00 per acre, and subject to other terms and conditions set out in such agreement, which is of record in Vol. 197, pages 400–402 of the Deed Records of Webb County, and to which agreement and the record thereof reference is here made for all purposes; and

"Whereas, the said First Parties have agreed to sell the said tracts of land to Maurice M. Alexander, in accordance with the provisions contained in said agreement.

"Now This Agreement Witnesseth, that the said First Parties agree to sell, and the Second Party agrees to buy the land hereinafter described upon the terms and conditions set out in the above described agreement of record in Vol. 197, pages 400–402 of the Webb County Deed Records, and upon the terms and conditions herein set out.

"1. The land referred to consists of land out of the northern part of what is known as the L. R. Ortiz Ranch located about fifteen miles north of the City of Laredo, in Webb County, Texas, and consisting of the following pastures and parts of pastures composing a part of said ranch:

"(a) All of what is known as the Middle Pasture;

"(b) All of what is known as the Charco Pasture;

"(c) The West one-half of the Abras Pasture;

making an aggregate of approximately Twenty Thousand (20,000) acres.

"2. Second Party agrees to pay for the above described land, the sum of $8.00 per acre in accordance with the terms and provisions of said agreement of July 11, 1947, and shall be paid in cash to the said Anita Ugarte de Ortiz, her heirs or assigns upon the delivery to Second Party of a deed conveying the title to the above described premises that is required to be conveyed under the terms of said agreement. It is understood that such title is the title owned by the said Anita Ugarte de Ortiz on the date of the execution of said agreement of July 11, 1947.

"3. Upon the execution of this instrument it is understood that the abstracts of title to such land shall be forthwith delivered to Second Party in accordance with the terms of said agreement of July 11, 1947, and in the event the land herein described is conveyed by the said Anita Ugarte de Ortiz to a third person, it is

understood that Second Party shall advise such third person that this agreement has been executed, and upon the receipt of Second Party of assurance from such third person that he will execute the necessary instruments to effectuate the transfer of title to Second Party, the said Second Party shall be under the obligation to procure supplemental abstracts of title to said land from Henry Abstract Company, and to survey said land in accordance with the provisions of said agreement of July 11, 1947. In the event such third person may refuse to recognize the validity of the rights of Second Party hereinunder, the latter may, upon instructions of any one of his principals, advise First Parties of his desire to rescind this agreement, whereupon this agreement shall be rescinded unless another principal of Second Party shall advise Second Party of his desire to acquire the pasture of such principal who desires to rescind; in such event such principal shall succeed to the rights of the principal who desires to rescind.

"4. Second party shall have 30 days from the time such abstracts are delivered to him within which to have the same examined by his attorneys. This agreement shall then be consummated by the execution and delivery of a deed conveying the title to said land, as required in paragraph 2, supra, upon the payment by Second Party to First Party, her heirs or assigns, of the sum of $8.00 per acre. It is understood that in the event any liens, encumbrances or other title defects have arisen subsequent to the execution of said instrument of July 11, 1947, that Second Party may require that such defects be remedied prior to the consummation of this agreement.

"5. It is understood that Second Party is acting as agent for A. F. Muller in the purchase of the portion of the above tract of land known and described as the Middle Pasture, and as agent for I. Alexander, a partnership, in the purchase of the portion of the above tract of land known as the Charco Pasture.

"6. It is agreed that in the event the land herein described shall be conveyed by the said Anita Ugarte de Ortiz before a deed can be executed and delivered to Second Party herein under this agreement, the deed executed by such third person in compliance with this agreement shall convey said land by special warranty deed.

"7. This instrument shall be binding upon the parties hereto, their heirs and assigns.

"In Witness Whereof the said parties have hereunto subscribed their names this 28th day of August, 1947, at Laredo, Texas.
　　　"(Signed) P. O. Villarreal
　　　"(Signed) Joe A. Ortiz,
　　　　　　　　　　　　First Parties.
　　　"(Signed) Maurice M. Alexander,
　　　　　　　　　　　　Second Party."

It is stipulated that the signature to the following letter dated August 28, 1947, is the genuine signature of Mrs. Anita Ugarte de Ortiz:

　　　　　　　　　"Laredo, Texas,
　　　　　　　　　August 28, 1947.
"Mr. P. O. Villarreal,
Mr. Joe A. Ortiz.

"I approve and agree to the sale of the tract of land containing approximately 20,000 acres of the L. R. Ortiz Ranch to Mr. Maurice M. Alexander, I. Alexander and A. F. Muller, according to my agreement with you dated July 11, 1947, at $8.00 per acre net."
　　　　"(Signed) Anita Ugarte De Ortiz."

Appellants earnestly insist that under the above jury finding the deed executed by Mrs. Ortiz did not operate as a conveyance of the property therein described to O. W. Killam on August 27, 1947, because there was no intention of the grantor, Mrs. Ortiz, to deliver it to Killam on that day, and it was her intention that Hicks deliver it to Killam on September 1st. It is argued that Hicks was Mrs. Ortiz's attorney and agent, and that she could have recalled the deed from him at any time before he delivered it to Killam. We cannot agree with this contention. Mrs. Ortiz retained no control over the deed and made no attempt to regain possession of it. The fact that she had the power to do so is of no consequence. Taylor v. Sanford, 108 Tex. 340, 193 S.W. 661, loc. cit. 662, (2–4), 5 A.L.R.

1660. No reason is disclosed why she should have done so. Killam had paid her $150,000.00 by check on August 27th, which she deposited to her account in a bank on August 28th. Killam had executed notes for the balance of the agreed purchase price and a deed of trust securing them, and delivered such notes and deed of trust to Mrs. Ortiz on August 27th. There was nothing further for him to do in order to consummate the deal. We think under such circumstances and in view of the jury finding that she intended that Hicks deliver the deed to Killam on September 1st, such delivery related back to August 27, when Mrs. Ortiz delivered the deed to Miss Ochoa for delivery to Hicks, and effected a valid delivery to Killam on that date. Ragland v. Kelner, Tex.Sup., 221 S.W.2d 357, loc. cit. 359 (3) and authorities there cited. If we should be mistaken in this view, nevertheless we are convinced that the delivery of the deed to Miss Ochoa for delivery to Hicks was a sufficient memorandum in writing to take the transaction out of the Statute of Frauds, Oliver v. Corzelius, Tex.Civ.App., 215 S.W.2d 231, reversed on other grounds Corzelius v. Oliver, Tex.Sup., 220 S.W.2d 632, and that Killam having fully performed his part of the contract was entitled to require performance by Mrs. Ortiz and became the equitable owner of the property on August 27, 1947. Appellants make the further contention that even though Mrs. Ortiz's deed was effective as a conveyance to Killam on August 27, yet by its terms such conveyance was made subject to the contract of July 11th between Mrs. Anita Ugarte de Ortiz and P. O. Villarreal and Joe A. Ortiz which had not expired, and Killam assumed all of Mrs. Ortiz's obligations and liabilities under such contract; that the right of Mrs. Ortiz to approve and sign any sales contract comprehended by the agreement of July 11th was personal to her and was not assignable and that she having exercised such right Killam is bound by her obligation to the purchasers in such sales contract to convey the 20,000 acres to them. We are not in accord with this contention for several reasons. At the time Mrs. Ortiz executed the deed to Killam she was under no obligation to anyone under the instrument of July 11. Such instrument is neither an exclusive agency contract nor an exclusive sales contract. It very closely resembles a mere nudum pactum. It obligates Mrs. Ortiz to do nothing. It does not constitute P. O. Villarreal and Joe A. Ortiz her exclusive agents to sell the 20,000 acres; all they are authorized to do is to "produce and present to her a buyer who is able, ready and willing to buy and to present a contract with such buyer to her for her approval." Under the 6th clause of such instrument she has the absolute right to determine whether such contract is satisfactory to her and to refuse to approve it. She having incurred no obligation under the instrument of July 11th, when she executed her deed to Killam, it may be questioned whether Killam by his acceptance of the deed agreed to carry out any obligation which she might thereafter assume, and whether if he did such an agreement would bind him, it being uncertain whether Mrs. Ortiz would assume any obligation under the July 11th agreement. Baker v. Baker, Tex.Civ.App., 207 S.W. 2d 244, Wr.Ref., and authorities there cited. However, in any event Killam did not agree to assume any obligation which Mrs. Ortiz might incur under the contract of July 11. Clause 5 of the deed above quoted limits Killam's assumption of any obligation or liability which Mrs. Ortiz might incur under the instrument of July 11th to such obligation or liability which she might incur to the party or parties to such instrument. The prospective purchasers under the proposed contract of August 28th were not parties to the instrument of July 11th. Mrs. Ortiz, if obligated to them at all, was not obligated to them as such parties. The only parties to the agreement of July 11th to whom she could become obligated were P. O. Villarreal and Joe A. Ortiz, and the only obligation she could incur to them by her failure to convey to a purchaser they had produced and she had approved, would have been to pay them the commission they would have received from such purchaser; therefore Killam assumed no obligation to

such prospective purchasers. We entertain grave doubt whether Mrs. Ortiz became obligated to the prospective purchasers under the proposed contract of August 28th and her letter of August 28th. We are inclined to agree with appellants that her right to approve or disapprove any proposed purchaser and sales contract which Villarreal and Joe Ortiz might submit to her was so personal that she could not assign it; also that her letter of August 28th is sufficient to evidence a waiver of the provisions of the July 11th instrument that she should sign any sales contract before it should be binding on her, and that a survey should be made. Even so, it seems to us that the proposed sales contract of August 28th is entirely lacking in mutuality. By the third clause thereof Alexander reserved the absolute right to rescind the contract if the land had been conveyed to a third party who might refuse to recognize the validity of the rights of Second Party thereunder. He was not bound by it unless he wanted to be so bound. Clearly there was no mutuality of obligation. There could be mutuality of remedy only if the court was satisfied in the present suit that the purchaser would pay the agreed price if Mrs. Ortiz or Killam or both of them should attempt to specifically enforce the contract. Sanderson v. Sanderson, 130 Tex. 264, 109 S.W.2d 744, loc. cit. 748, (14–15) Com.App. Opinion adopted. No such relief was sought by Mrs. Ortiz or Mr. Killam. However, we are satisfied that if the agreement of August 28th is not lacking in mutuality and if Mrs. Ortiz was obligated by it to the proposed purchasers who are appellants, Killam did not assume such obligation by the provisions of the deed above referred to.

■ Another contention is that in view of the circumstances under which Mrs. Ortiz executed the deed, Killam holds the property as a constructive trustee for appellants, the prospective purchasers, under the contract of August 28th. In view of appellants' insistence that the attorney who prepared appellees' brief was not familiar with the record since he did not participate in the trial, and that he did not correctly present the true facts in appellees' brief, we have read the entire Statement of Facts. We find nothing therein that would warrant the imposition of a constructive trust on the 20,000 acres in question. We may assume that Killam knew that appellants had been negotiating with Villarreal and Joe Ortiz for a deal on the 20,000 acres and that Mrs. Ortiz had verbally assured Maurice Alexander that if such deal were made she would approve it; also that Killam was anxious to close his deal with Mrs. Ortiz before she approved any such deal with appellants; that he paid Miss Ochoa $5,000 for her influence with Mrs. Ortiz in persuading her to accelerate the closing of the deal with Killam on August 27th rather than on September 1st as originally contemplated, although we find no evidence to warrant such assumption other than the fact that Killam did pay Miss Ochoa $5,000 and that she was a close friend and confidant of Mrs. Ortiz, and unquestionably had a great deal of influence with her. We fail to comprehend how Killam's payment of $10,000 to Joe Ortiz, and $20,353.85 to Mr. Hicks could have any bearing on the question of a constructive trust. Killam's testimony that these items were a part of his deal with Mrs. Ortiz which she required him to pay, and the amounts of which he ascertained before he verbally agreed with her to purchase the ranch is uncontroverted. Assuming all these facts, nevertheless at the time Mrs. Ortiz executed the deed to Killam appellants had no interest in the property, either legal or equitable. Killam was at liberty to do all that he could to acquire the property before appellants acquired such interest. Appellants have cited no authority which would authorize the imposition of a constructive trust under such circumstances and after diligent search we have found none. Our conclusion is that all of appellants' points should be and they are overruled, and that the judgment of the trial court should be, and it is in all respects affirmed.